IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KRAFT HEINZ FOODS COMPANY,<br><br>PLAINTIFF,<br><br>v.<br><br>ZACHARY KLEIN and GOLDEN STATE FOODS CORPORATION,<br><br>DEFENDANTS. | CASE NO. _____<br><br>Underlying Case<br>C.A. No. 22-1136-JHS<br>(D. Del.)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL DOCUMENTS RESPONSIVE TO A RULE 45 SUBPOENA** |

## INTRODUCTION

Petitioners Golden State Foods Corporation ("GSF") and Zachary Klein ("Mr. Klein") move to compel the production of documents responsive to the Rule 45 subpoena served on Mitchell Dingwall ("Mr. Dingwall") in the above-captioned action. In that action, Kraft Heinz Foods Company ("Kraft Heinz") brings claims for misappropriation of trade secrets and confidential information based, in part, on allegations lodged by Mr. Dingwall, a former GSF employee. Mr. Dingwall was terminated in August 2022. After his termination, and after GSF refused to accede to monetary and other demands he made with respect to his termination, Mr. Dingwall alleged that Mr. Klein—a former Kraft Heinz employee—had shared Kraft Heinz's trade secrets and confidential information with GSF. His allegations prompted Kraft Heinz to sue petitioners.

Petitioners' subpoena to Mr. Dingwall seeks highly relevant materials. Among other things, petitioners seek Mr. Dingwall's communications with Kraft Heinz; documents sufficient to show the date and time of those communications; documents related to allegations attributable to Mr. Dingwall in Kraft Heinz's complaint; documents that Kraft Heinz alleges—based on Mr. Dingwall's report— were provided to Mr. Dingwall by Mr. Klein; emails and documents that Mr. Dingwall misappropriated from GSF prior to his termination; and communications related to the reason for Mr. Dingwall's termination, which Kraft Heinz restyles as his "resignation" and alleges was "in large part because of" petitioners' alleged use of Kraft Heinz information.

Mr. Dingwall did not object to *any* of these requests. Thus, there are no objections for this Court to resolve. Rather, Mr. Dingwall produced a limited amount of documents responsive to some requests and claimed nothing else existed. That representation is belied, however, by certain undisputed facts that demonstrate Mr. Dingwall has refused to conduct the type of inquiry required by the Federal Rules in responding to petitioners' subpoena. Other circumstances surrounding his response cast doubt on the integrity of his investigation—including his initial default, glaring omissions in his original production, his failure to remedy ongoing deficiencies, and his belated claim to have deleted responsive materials. Moreover, Mr. Dingwall's representation in his written response that he

possesses documents responsive to all requests in petitioners' subpoena is inconsistent with the content of his production. Despite multiple letters from petitioners' counsel, Mr. Dingwall has refused to address these deficiencies and has refused to respond to petitioners' last request that he conduct a more diligent search to avoid motion practice.

In light of Mr. Dingwall's non-compliance with the subpoena, petitioners now ask the Court to order Mr. Dingwall to produce all responsive materials and a compliant written response that identifies the materials responsive to each request in petitioners' subpoena and the request(s)—if any—for which no responsive materials exist. Petitioners further ask the Court to order Mr. Dingwall to provide an affidavit detailing (i) the searches conducted in response to petitioners' subpoena, including, but not limited to, the electronic systems searched and the search terms applied, and (ii) the circumstances under which any responsive materials were deleted or destroyed. Finally, if responsive materials were deleted or destroyed, as Mr. Dingwall's counsel represents they were, petitioners ask the Court to order a forensic examination of Mr. Dingwall's electronic accounts and devices to locate materials responsive to petitioners' subpoena.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. GSF Hires Mr. Klein; Kraft Heinz Takes No Action In Response**

In or about May 2022, Mr. Klein left his employment with Kraft Heinz and began his employment with GSF. *See* Ex. 2 at ¶¶ 22–23.[1] Kraft Heinz learned of his employment with GSF on May 31st—his first day with the company. Ex. 1 at ¶ 66.[2] Three days later—on June 3rd—Kraft Heinz sent Mr. Klein a letter instructing him to delete any Kraft Heinz confidential information in his possession. *Id.* at ¶ 85. In response, Mr. Klein undertook good faith efforts to search for and delete or destroy Kraft Heinz confidential information in his possession. Ex. 2 at ¶ 29.

Months passed and Kraft Heinz took no action with respect to Mr. Klein's GSF employment. *Id.* at ¶¶ 8–9, 23–26.

**B. GSF Terminates Mr. Dingwall; Mr. Dingwall Thereafter Fabricates Allegations Of Misappropriation Against GSF And Mr. Klein**

On August 12, 2022, GSF terminated Mr. Dingwall. Ex. 14 at MD0009; *see also* Schwartz Decl. ¶ 2. The next business day—August 15th—Mr. Dingwall filed

---

[1] All exhibits are attached to the Declaration of Jeffrey A. Schwartz dated November 30, 2022 ("Schwartz Decl.").

[2] Kraft Heinz alleges that Mr. Klein was "evasive" about his new employer. *Id.* at ¶ 65. Mr. Klein disputes that allegation. Ex. 2 at ¶ 65. Prior to his departure, Mr. Klein told his supervisor that he had accepted a position with a privately-held company in the foodservice business. *Id.*

a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Ex. 14 at MD0005. He claimed GSF had terminated him for reporting alleged discrimination against two female employees, *id.* at MD0005–10—a claim GSF disputes. Later that day, Mr. Dingwall sent GSF a letter demanding more than $350,000 and various unearned benefits. Ex. 14 at MD0065–58.

On or about August 18th—having received no response to his "demands"— Mr. Dingwall came up with new allegations against GSF. Ex. 14 at MD0001. Among other things, he claimed that Mr. Klein had shared Kraft Heinz confidential information with other GSF employees. *Id.*

Based on petitioners' investigation, Mr. Dingwall did not make any verbal or written complaints about Mr. Klein or any other GSF employee having or using Kraft Heinz confidential information prior to his (Mr. Dingwall's) termination. Ex. 3. Nor did Mr. Dingwall include any allegations to that effect in his Charge of Discrimination. *See generally* Ex. 14 at MD0005–10. It was only after GSF terminated Mr. Dingwall, and after GSF declined to meet his "demands," that Mr. Dingwall made any complaint about Mr. Klein or the alleged use of Kraft Heinz confidential information. *See id.* at MD0001.

GSF terminated Mr. Dingwall on a Friday. The following business day— Monday, August 15th—GSF employee Taylor Ackerman, who reported to Mr. Dingwall, resigned effective immediately and retained the same attorney as Mr.

Dingwall, Arnold Lizana. Schwartz Decl. ¶ 4. On August 17th, Ms. Ackerman filed a Charge of Discrimination with the EEOC based in part on allegations supplied by Mr. Dingwall. Ex 14 at MD0012–13, ¶¶ 5, 6, 8.

## C. Kraft Heinz Sues GSF and Mr. Klein Based On Mr. Dingwall's Fabricated Allegations of Misappropriation

On an unknown date—presumably between August 15th and 30th—Mr. Dingwall submitted a written complaint to Kraft Heinz alleging that Mr. Klein had shared Kraft Heinz information with other GSF employees. *See* Ex. 19 at 1.[3] On August 30th, based on Mr. Dingwall's allegations, Kraft Heinz sued GSF and Mr. Klein in the United States District for the District of Delaware for misappropriation of trade secrets and confidential information, among other claims. *See* Ex. 1.

Each allegation in Kraft Heinz's complaint relating to actual *use* of trade secrets or confidential information is attributable to Mr. Dingwall. *Id.* at ¶¶ 4, 83, 88–91. Based on information "provided" by Mr. Dingwall, Kraft Heinz alleges that Mr. Klein "has been using Kraft Heinz's trade secrets to provide Golden State with an unfair advantage … [and his] misconduct is being applauded and encouraged by

---

[3] Documents sufficient to show the date and time of Mr. Dingwall's communications with Kraft Heinz are among the records petitioners seek through the subpoena. Because of Mr. Dingwall's incomplete production, petitioners do not yet know the date of his first communication with Kraft Heinz.

Golden State management." *Id.* at ¶ 4.[4] In particular, based on Mr. Dingwall's report, Kraft Heinz alleges that Mr. Klein and GSF have used Kraft Heinz information relating to, among other things, (i) "new product development," (ii) "specific incentives" offered to "a particular customer," (iii) "a customer bidding process" in which "Kraft Heinz and GSF are competing," and (iv) "customer-specific pricing [on] Golden State's active bids." *Id.* at ¶ 4, 83, 88, 89. Kraft Heinz also alleges, based on Mr. Dingwall's report, that Mr. Klein provided Mr. Dingwall with hard copies of Kraft Heinz stage gate materials and that Mr. Dingwall "resigned" from GSF "in large part because of" petitioners' alleged use of Kraft Heinz information. *Id.* at ¶¶ 90–91.

Petitioners dispute these allegations. *See* Ex. 2 at ¶¶ 4, 83, 88–91.

**D. GSF Discovers That Mr. Dingwall Sent Himself Hundreds Of GSF Emails And Documents And Deleted Thousands Of Others**

Following Mr. Dingwall's termination, GSF searched his company email account. Schwartz Decl. ¶ 5. GSF discovered that, in the period immediately prior to his termination, Mr. Dingwall had forwarded hundreds of emails and documents

---

[4] Kraft Heinz identifies Mr. Dingwall in its complaint as "a confidential source [who] until recently worked for Golden State [and] provided information to Kraft Heinz[.]" *Id.* ¶ 4. Kraft Heinz has since confirmed that Mr. Dingwall is its so-called confidential source. Petitioners are unaware of any basis for Kraft Heinz to have withheld Mr. Dingwall's identity in its complaint. Mr. Dingwall has freely broadcast his role in precipitating this litigation. *See* Part E, *infra*.

to his Gmail account and deleted thousands of others. *Id*. GSF believes the deleted emails include some of the emails that Mr. Dingwall forwarded to his Gmail account and continues to investigate whether that is the case. *Id*.

Certain files Mr. Dingwall forwarded to himself contain confidential GSF information, including product and ingredient information for several accounts and manufacturing information. Ex. 14 at MD0015. Mr. Dingwall also sent files containing GSF's confidential information to third parties. *Id.* Those files contain, among other things, product development information and data points GSF obtained from paid consultants. *Id.* Mr. Dingwall's conduct violated, among other things, a confidentiality agreement between GSF and Mr. Dingwall. *Id.* at 1–3.

On September 29th, GSF sent Mr. Dingwall a letter regarding the forwarding of GSF emails and documents to Mr. Dingwall's Gmail account. *Id.* at MD0015–17. The letter instructed Mr. Dingwall to cease and desist from using or disclosing GSF confidential information. The letter also stated:

> In addition, you are hereby instructed ***not to delete, alter, destroy*** or in any manner tamper with any electronic, written or other records, documents or files, including email and voicemail, which may in any way relate to this matter. Any destruction of any such evidence would constitute spoliation of evidence …[.]

*Id.* at MD0017 (emphasis added).

**E. GSF Obtains A Temporary Restraining Order Based On Mr. Dingwall's Unwelcome Contact With GSF Employees**

In August and September 2022, following Mr. Dingwall's termination, Mr. Dingwall sent harassing and threatening communications to GSF employees. *See* Ex. 2 at ¶ 5; Ex. 4; Ex. 5. For example, on or about September 3rd, Mr. Dingwall sent a text message to a senior GSF executive that read "Good morning Coward! I was just enjoying some coffee and thinking about what a self-serving/narcissistic and pathetic example of leadership you are … Anyway just wanted to say a big☝! Let's hope we never run into each other." Ex. 4. Certain unwanted communications from Mr. Dingwall also concerned the litigation he caused Kraft Heinz to file against GSF and Mr. Klein. For example, on or about September 7th, Mr. Dingwall sent a text message to another GSF employee that reads "What is up with your boy?" along with links to articles about Kraft Heinz's lawsuit. Ex. 5.

On or about September 13th, GSF sought and obtained a temporary protective order in Oconee County Superior Court based on Mr. Dingwall's unwanted contact with its employees. *See* Ex. 6.

On October 12th, the parties appeared for a hearing on GSF's request for a protective order. *See* Ex. 14 at MD0025. During the hearing, Mr. Dingwall testified that the communications between himself and GSF employees that were the subject of the hearing were in his possession and "on [his] phone." *Id.* at MD0034–

9

35. Indeed, he offered to retrieve the communications from his phone during his testimony. *Id.* at MD0037.[5]

**E. Petitioners Subpoena Mr. Dingwall; Despite Two Deficiency Letters, Mr. Dingwall's Written Response And Production Remain Inadequate**

On October 25, 2022, petitioners served a subpoena on Mr. Dingwall via personal service with the place of compliance identified as the Atlanta office of Jackson Lewis—which is located within 100 miles of Mr. Dingwall's residence. Ex. 8; Ex. 9.[6] Schedule A to the subpoena included nineteen document requests and Exhibit 1 to the subpoena was Kraft Heinz's complaint. *See generally* Ex. 8. The return date of the subpoena was November 7th. *Id.*

The return date passed without any written objection, written response, or production from Mr. Dingwall. On November 9th, petitioners' counsel emailed Mr. Lizana, Mr. Dingwall's counsel, to ask when Mr. Dingwall would comply and produce responsive documents. Ex. 10. Two days later, on November 11th, Mr.

---

[5] The hearing resolved when GSF agreed to voluntarily withdraw its request for a protective order based on Mr. Dingwall's agreement to stop contacting GSF employees. *See* MD0025–33.

[6] On October 21st, petitioners' counsel emailed Mr. Dingwall's counsel, Mr. Lizana, to ask whether he would accept service of petitioners' subpoena. *See* Ex. 7. Because Mr. Lizana failed to respond, petitioners were compelled to undertake the expense of personal service.

Lizana responded and asked for a Word copy of Schedule A—which petitioners'
counsel provided within the hour. Ex. 11.

Five days later, on November 16th, Mr. Lizana sent petitioners' counsel a
written response and a production from Mr. Dingwall totaling only 64 pages—the
bulk of which was the transcript of the October 12th hearing. Ex. 12; Ex. 13; Ex.
14. It was clear Mr. Dingwall had withheld responsive documents—including
documents referenced within his production, such as email attachments. *See* Ex. 15
at 1; Ex. 14 at MD0009. Mr. Dingwall's production also did not include, among
other missing materials, any communications with Kraft Heinz, any of the
communications with GSF employees about which Mr. Dingwall testified on
October 12th, or any of the emails Mr. Dingwall forwarded from his GSF account
to his Gmail account. Ex. 15 at 1. Moreover, Mr. Dingwall's written response did
not object to any request and reflected that he possessed documents responsive to
each and every request in petitioners' subpoena. *See generally* Ex. 13. But Mr.
Dingwall's production contained no documents responsive to several requests.
*Compare* Ex. 14 *with, e.g.*, Ex. 8 at Request Nos. 5, 7–8, 10, 13, 15.

On November 18th, petitioners' counsel sent Mr. Lizana a letter asking that
Mr. Dingwall undertake a search compliant with the Federal Rules and provide a
complete production with a compliant written response on or before November
23rd. *See generally* Ex. 15.

11

On November 22nd, Mr. Lizana sent petitioners' counsel an amended written response and a supplemental production totaling only 16 pages. Ex. 16; Ex. 17; Ex. 18. It was clear Mr. Dingwall continued to withhold responsive documents, including, for example, communications with Kraft Heinz, documents sufficient to show the time and date of such communications, communications with third parties such as Ms. Ackerman, and the stage gate materials Kraft Heinz alleged— based on Mr. Dingwall's report—were provided to Mr. Dingwall by Mr. Klein. Ex. 19 at 1–2. Moreover, Mr. Dingwall's amended written response still reflected that Mr. Dingwall possessed responsive documents to each request even though his supplemental production contained no documents responsive to several requests. *Compare* Ex. 18 *with, e.g.*, Ex. 8 at Request Nos. 8, 10, 13, 15.

The November 22nd transmittal email from Mr. Lizana also revealed that Mr. Dingwall had deleted materials responsive to petitioners' subpoena. In particular, Mr. Lizana represented that Mr. Dingwall had deleted the communications with GSF employees about which he testified during the October 12th hearing. Ex. 16 at 1. Mr. Lizana also represented that Mr. Dingwall had deleted the emails he forwarded from his GSF account to his Gmail account that were "unrelated" to his discrimination complaints. *Id.* at 2. Although Mr. Lizana claimed that Mr. Dingwall deleted those emails "per Defendant's [*sic*] instruction," *id.*, petitioners never instructed Mr. Dingwall to delete any emails.

On November 23rd, petitioners' counsel sent Mr. Lizana a letter again asking that Mr. Dingwall undertake a search compliant with the Federal Rules and amend his written response and supplement his production on or before November 23rd. *See generally* Ex. 19. Petitioners' counsel also asked, among other things, that Mr. Dingwall provide information concerning his deletion of the communications with GSF employees and forwarded emails—as required by Instruction No. 8 in petitioners' subpoena. *Id.* at 2–3; Ex. 8 at Instruction No. 8.

Neither Mr. Dingwall nor his counsel has responded to petitioners' November 23rd letter.

## LEGAL STANDARD

Rule 45 permits parties to procure discovery from nonparties through the service of subpoenas. Rule 45(c)(3)(A). The "same standard" outlined in Rule 26 governs the scope of subpoenas. *Conaway v. H & R Block E. Enterprises, Inc.*, 240 F. Supp. 3d 1353, 1356 n.3 (S.D. Ga. 2017). In particular, parties may obtain discovery from nonparties "'regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]'" *Id.* (quoting Rule 26(b)(1)). Written objections by nonparties must be served before the earlier of the return date or 14 days from service. Rule 45(c)(2)(B). "Failure to serve [a] written objection [within that time] typically waives any objections[.]" *Patel v. Bhakta*, 2015 WL 12159208, at *2 (N.D. Ga. Apr. 29, 2015) (collecting

13

cases); *see also Madeline LLC v. Street*, 2009 WL 1563526, at *1 (S.D. Fla. June 3, 2009) (similar).

Rule 45 also sets forth the procedures for parties to obtain orders of compliance. In particular, "[a]t any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i); *see also, e.g.*, *Patel*, 2015 WL 12159208, at *2 ("Here, KPPB was served with the subpoenas [ ] in Atlanta [ ] and the subpoenas command them to produce the required documents in Atlanta … [therefore] this Court has the authority to enforce the subpoenas").

## **ARGUMENT**

Mr. Dingwall has refused to conduct the type of search required by the Federal Rules in responding to petitioners' subpoena. His production is incomplete as evidenced by the fact that materials known to exist were not produced. Even without demonstration of that fact, it is implausible that Mr. Dingwall's paltry 80-page production—nearly half of which is a single court transcript—constitutes the universe of responsive materials. Still other circumstances cast doubt on the integrity of his investigation and the veracity of his representations—including his failure to remedy ongoing deficiencies and his claim to have deleted responsive materials. Moreover, the representation in his written response that he possesses

14

materials responsive to all requests in petitioners' subpoena is inconsistent with the content of his production and makes it impossible to determine the extent to which he continues to withhold.

**A. Mr. Dingwall's Production Is Incomplete**

It is clear Mr. Dingwall continues to withhold responsive documents despite petitioners' attempts to corral his compliance with petitioners' subpoena. Among other things, he has not produced any communications with Kraft Heinz. In response to petitioners' November 18th letter, Mr. Dingwall's counsel represented that Mr. Dingwall's communications with Kraft Heinz were strictly verbal. Ex. 16 at 1. That is not accurate. Petitioners know that Mr. Dingwall had at least one written communication with Kraft Heinz because Kraft Heinz has represented that he submitted a written complaint to it and has quoted that complaint in correspondence with petitioners. Ex. 19 at 1.

Mr. Dingwall also continues to withhold documents relating to the time and date of his communications with Kraft Heinz. In particular, his November 22nd production includes a single calendar entry reflecting a single meeting with Kraft Heinz on August 30th—the same date the complaint was filed. It is improbable, particularly in light of Kraft Heinz's detailed allegations concerning Mr. Dingwall, *see* Ex. 1 at ¶¶ 4, 83, 88–91, that the only communications between Mr. Dingwall and Kraft Heinz consist of a single written complaint followed by a single one hour

meeting on the same date Kraft Heinz filed its lengthy complaint based on Mr. Dingwall's allegations. Moreover, the August 30th meeting must have been placed on Mr. Dingwall's calendar because of prior coordination and communications with Kraft Heinz, none of which has been produced.

Mr. Dingwall's production likewise includes no communications with Ms. Ackerman. Mr. Dingwall was terminated on a Friday. Ms. Ackerman resigned on Monday and immediately retained Mr. Lizana to lodge discrimination complaints based on allegations supplied by Mr. Dingwall. *See* MD0012–13 at ¶¶ 5, 6, 8. Petitioners' subpoena seeks, among other things, documents and communications related to Mr. Dingwall's purported "resignation" from GSF and the reason(s) for his "resignation." *See* Ex. 8 at Request No. 19. It is implausible that Mr. Dingwall possesses no communications with Ms. Ackerman responsive to this request. Such communications bear on Mr. Dingwall's animosity towards GSF and undermine Kraft Heinz's allegations that his departure had anything to do with Mr. Klein or alleged use of Kraft Heinz information.[7]

By way of another example, Mr. Dingwall's production includes no documents or communications relating to the stage gate materials that Kraft Heinz

---

[7] Communications with Ms. Ackerman are also responsive to other requests— including, for example, petitioners' request for documents and communications relating to GSF. *Id.* at Request No. 6.

alleges—based on Mr. Dingwall's report—were provided to Mr. Dingwall by Mr. Klein. Ex. 1 at ¶ 90; Ex. 8 at Request No. 15. Mr. Dingwall's amended written response reflects that he possesses materials relating to this subject matter. *See* Ex. 17 at Request No. 15. But his production does not include any responsive communications or any documents purporting to have originated at Kraft Heinz— let alone Kraft Heinz stage gate materials. *See generally* Ex. 14; Ex. 18.

On top of Mr. Dingwall's failure to produce responsive materials known or highly likely to exist, the circumstances of his response to petitioners' subpoena cast doubt on the integrity of his inquiry. First, Mr. Dingwall defaulted on petitioners' subpoena and made a belated production that omitted obvious responsive materials—such as his demand letter to GSF and the calendar invitation from Kraft Heinz. *See* Ex. 15 at 1. Second, Mr. Dingwall has failed to remedy ongoing deficiencies addressed in petitioners' letters—such as the inconsistency between the content of his production and his claim to possess documents responsive to each request. *See* Ex. 15 at 2; Ex. 19 at 3; Part B, *infra*. Third, and most important, Mr. Dingwall now claims to have deleted responsive materials.

In particular, during the October 12th hearing on GSF's motion for a protective order, Mr. Dingwall testified that text messages with GSF employees responsive to Request No. 6 in petitioners' subpoena were in his possession and "on [his] phone." Ex. 14 at MD0034–35. Indeed, he offered to retrieve the text

messages from his phone during his testimony. *Id.* at MD0037. Yet it appears from

Mr. Lizana's November 22nd email that Mr. Dingwall claims to have since deleted

them. Ex. 16 at 1. Mr. Lizana's November 22nd email also acknowledges that Mr.

Dingwall forwarded emails from his GSF account to his Gmail account—the

subject of Request No. 7 in petitioners' subpoena—but claims that Mr. Dingwall

since deleted emails "unrelated" to his discrimination complaints "per

[petitioners'] instruction." *Id.* at 2. Petitioners did not instruct Mr. Dingwall to

delete any emails. On the contrary, petitioners' counsel sent Mr. Dingwall a letter

demanding that he "not delete, alter, destroy or in any manner tamper with" the

emails forwarded to his Gmail account. Ex. 14 at MD0017.

Mr. Dingwall's deletion of these materials—if that is in fact what

happened—constitutes spoliation. Although petitioners' subpoena instructed Mr.

Dingwall to identify all responsive materials no longer in his possession, he made

this claim only ***after*** petitioners challenged omissions in his production. *See* Ex.

16. His failure to come forward with this information in his original response and

his continued refusal to comply with the instruction in petitioners' subpoena means

that neither petitioners nor the Court can place any confidence in the fulsomeness

of his production. Moreover, it is clear Mr. Dingwall anticipated litigation

involving GSF on one subject or another from the moment of his departure. *See,

e.g.*, Ex. 18 at MD0065. His deletion of communications relating to GSF—

including communications relating to Kraft Heinz's action against GSF, *see* Ex. 4—undermines the integrity of his production *and* his representations. Mr. Dingwall has also attempted to lay blame with petitioners on this front when petitioners instructed him to preserve evidence—not delete it.[8]

## B. Mr. Dingwall's Written Response Is Deficient

Mr. Dingwall's written response to petitioners' subpoena also does not comport with his obligations under the Federal Rules. Despite petitioners' multiple letters on the subject, *see* Ex. 15 at 2; Ex. 19 at 3, Mr. Dingwall's written response continues to reflect that he possesses documents responsive to each request in

---

[8] The deletion of emails that are the subject of petitioners' September 29th letter and responsive to Request No. 7 in petitioners' subpoena is particularly alarming. It appears Mr. Dingwall has produced only *one* email responsive to Request No. 7. Ex. 14 at MD0072. Although his deficient response cannot be excused by the fact that GSF may possess some of the responsive documents, in this instance, GSF may not be able to confirm that fact because, prior to his departure, Mr. Dingwall may have deleted emails forwarded from his GSF account to his Gmail account. Schwartz Decl. ¶ 5.

Additionally, Kraft Heinz alleges—because Mr. Dingwall told it as much—that Mr. Dingwall resigned from GSF "in large part because of" Mr. Klein's alleged dissemination of Kraft Heinz information. *See* Ex. 1 at ¶ 91. Petitioners dispute Mr. Dingwall's allegations of misappropriation and dispute that his departure had anything to do with Mr. Klein or Kraft Heinz information. If the deleted emails are "unrelated" to Mr. Dingwall's discrimination claims, what *do* the deleted emails relate to? Petitioners are concerned that Mr. Dingwall has deleted emails relevant to their defenses in an action Mr. Dingwall himself brought about by lodging a false complaint with Kraft Heinz. *See* Ex. 1 at ¶¶ 4, 83, 88–91; Ex. 4.

petitioners' subpoena. *See generally* Ex. 17. His production, however, does not contain documents responsive to several requests. For example, there are no materials relating to the allegation that Mr. Klein provided information "in a customer bidding process where Kraft Heinz and Golden State are competing." Ex. 8 at Request No. 8. Likewise, there are no materials relating the allegation that Mr. Klein provided "the specific incentives Kraft Heinz offered to a particular customer." *Id.* at Request No. 13. Nor does Mr. Dingwall's production include any Kraft Heinz stage gate materials. *Id.* at Request No. 15. If Mr. Dingwall does not possess—and did not otherwise delete—materials responsive to certain requests in petitioners' subpoena, he must state as much.

Mr. Dingwall also has not amended his written response to indicate which documents in his production are responsive to which request. That information is required by Instruction No. 9 in petitioners' subpoena and the Federal Rules. Ex. 8 at Instruction No. 9; Rule 45(e)(1)(A) ("A person responding to a subpoena must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand"). Instead, Mr. Dingwall continues to refer petitioners to the entirety of his production in response to each request. *See generally* Ex. 17. This deficiency—coupled with the inconsistency between the content of his production and his claim to possess responsive materials for all requests—makes it impossible to assess the extent to

which he continues to withhold documents. It also creates ambiguity about the materials that **have** been produced. Among other things, Mr. Dingwall's written response makes it appear as though all documents in his production were shared by or with Mr. Klein and by or with Kraft Heinz. *See id.* at Requests Nos. 3, 4.

## C. The Court Should Order Mr. Dingwall To Produce All Documents Responsive To Petitioners' Subpoena, Among Other Relief

The record either shows or strongly suggests that Mr. Dingwall's production in response to petitioners' subpoena is incomplete. Mr. Dingwall also did not submit any written objections—let alone on or before the time allotted by Rule 45—and thus has waived all objections. *See* p. 13–14, *supra*. In similar circumstances, courts have granted motions to compel and ordered subpoenaed parties to produce all responsive documents. *See, e.g.*, *Madeline*, 2009 WL 1563526, at *1; *Sakhil Ctr. at Doral Condo. Ass'n, Inc. v. Hanover Ins. Co.*, 2019 WL 7881626, at *2 (S.D. Fla. Mar. 21, 2019); *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 671 (N.D. Fla. 2010).

In *Bailey*, for example, the court found the subpoenaed party's production incomplete based on its failure to produce responsive materials that were known or likely to exist. 270 F.R.D. at 671. The court reasoned that "[a]n earmark of a recipient's inadequate inquiry is the obvious absence of documents and other written materials that [he] reasonably would have been expected to retain[.]" *Id.*

(quotation omitted). To support its finding, the court also cited the "time line" of the subpoenaed party's involvement in underlying events and "certain actions" by the subpoenaed party that delayed resolution of the subpoena. *Id.* at 671–72. Likewise, in this case, materials Mr. Dingwall would have been expected to retain are absent from his production, and the time line of his involvement suggests other materials have been withheld. Certain actions by Mr. Dingwall—including his belated disclosure of the deletion of responsive materials and failure to remedy known deficiencies—also undermine the adequacy of his inquiry.

The Court should also order Mr. Dingwall to provide a compliant written response and an affidavit detailing (i) the searches conducted in response to petitioners' subpoena, including, but not limited to, the electronic systems searched and search terms applied, and (ii) the circumstances under which ***any*** responsive materials were deleted or destroyed, without limitation to the deleted responsive materials Mr. Dingwall has identified to date. A compliant written response that identifies the materials responsive to each request and the request(s) for which no responsive materials exist is necessary to assess the completeness of Mr. Dingwall's production. Moreover, "when it reasonably appears that a response is incomplete, the court may require … certification that the nonparty has conducted a search … and has determined that the information requested either does not exist or … has been produced." *Bailey*, 270 F.R.D. at 671–72 (quotation omitted).

Under the circumstances, an affidavit detailing the searches conducted and the circumstances under which Mr. Dingwall deleted responsive materials is also necessary to assess the completeness of his production.

Finally, if responsive materials were in fact deleted or destroyed, the Court should order a forensic examination of the electronic devices and accounts of Mr. Dingwall where materials responsive to petitioners' subpoena may be located or may have been located. Based on the representations in Mr. Lizana's November 22nd email, Mr. Dingwall deleted responsive materials at a point in time when he anticipated litigation involving GSF. Ex. 16. When—as here—there are "spoliation concerns," courts have granted motions to compel forensic examinations. *Barton & Assocs., Inc. v. Liska*, 2020 WL 8299750, at *1 (S.D. Fla. May 11, 2020); *see also, e.g.*, *Lima v. Lee*, 2021 WL 6197773, at *1 (S.D. Fla. Dec. 30, 2021); *Measured Wealth Priv. Client Grp., LLC v. Foster*, 2021 WL 309033, at *1 (S.D. Fla. Jan. 29, 2021); *Wynmoor Cmty. Council, Inc. v. QBE Ins. Corp.*, 280 F.R.D. 681, 687 (S.D. Fla. 2012).[9]

---

[9] It is yet to be determined whether Mr. Dingwall deleted the responsive materials (i) after GSF sent the letter demanding that he preserve the materials or, even worse, (ii) after petitioners served the subpoena. The information required by Instruction No. 8 in petitioners' subpoena and the affidavit petitioners request the Court to order Mr. Dingwall to submit, *see* p. 22, *supra*, should shed light on this issue.

In *Barton*, for example, the court ordered a forensic examination of the defendant's cellphone where the court was "concerned" the defendant had made an incomplete production of text messages and deleted or otherwise failed to preserve other text messages. 2020 WL 8299750 at *1, 3–4. Similarly, in *Measured Wealth*, the court ordered a forensic examination of the defendants' cellphone where he admittedly deleted "various relevant text messages" and his production had been "somewhat haphazard and incomplete," causing the court to be "concerned" that the defendant's search of his phone had been inadequate. 2021 WL 309033 at *1– 2. The case presents similar circumstances to *Barton* and *Measured Wealth*. Mr. Dingwall's production in response to petitioners' subpoena is missing responsive materials known or highly likely to exist, and Mr. Lizana has now represented that at least some of those materials were deleted by Mr. Dingwall.

To safeguard Mr. Dingwall's privacy concerns, petitioners propose a forensic examination protocol similar to the protocol set forth in *Measured Wealth*. *See* 2021 WL 309033 at *2–3. Petitioners' proposed protocol is appended to the Schwartz Declaration as Exhibit 20. Petitioners also propose that Mr. Dingwall bear the costs of the forensic examination because it was precipitated by his decision to delete responsive materials when litigation involving GSF was anticipated. *See Wynmoor*, 280 F.R.D. at 668 ("[I]f at a later time there is evidence of the Plaintiff's improper deletion of electronic documents or any other associated

improper conduct, the Court will revisit this issue and consider charging Plaintiff for the fees and costs of the independent expert …"). It would be unreasonable for petitioners to bear costs associated with Mr. Dingwall's own misconduct.

## <u>CONCLUSION</u>

Petitioners' subpoena was properly served and requests relevant materials. Mr. Dingwall has simply failed to adequately respond. This Court should grant petitioners' motion.

Respectfully submitted this 30th day of November 2022.

JACKSON LEWIS P.C.

*/s/ Jeffrey A. Schwartz*
Jeffrey A. Schwartz
Georgia Bar No. 558465
171 17th Street, NW
Suite 1200
Atlanta, Georgia 30363
(404) 525-8200
Jake.Schwartz@jacksonlewis.com

*Attorneys for Petitioners Golden State Foods and Zachary Klein*

OF COUNSEL

Robert I. Steiner (*PHV* forthcoming)
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
rsteiner@kelleydrye.com

## <ins>CERTIFICATE OF COMPLIANCE AS TO FONT SIZE</ins>

Pursuant to the Civil Local Rules of Practice for the United States District Court for the Northern District of Georgia, this is to certify that the foregoing complies with the font and point selections approved by the Court in Local Rule 5.1(B). The foregoing was prepared on computer using Times New Roman font (14 point).

Respectfully submitted, this 30th day of November 2022.

*/s/ Jeffrey A. Schwartz*
Jeffrey A. Schwartz
Georgia Bar No. 558465

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document will be served on Mitchell

Dingwall in a manner prescribed by Federal Rule of Civil Procedure 5 and a

further proof of service will be filed with the Court when service is effectuated.

Respectfully submitted this 30th day of November 2022.

*/s/ Jeffrey A. Schwartz*
Jeffrey A. Schwartz
Georgia Bar No. 558465
